## Utilization of Liquid Fuels Tax

JOSEPH L. DONNELLY, Deputy Attorney General, and THOMAS D. MCBRIDE, Attorney General, December 17, 1957.—You have inquired whether the provisions of section 10 of The Liquid Fuels Tax Act of May 21, 1931, P. L. 149, as amended, 72 PS §2611j, permit

a county to utilize moneys in its County Liquid Fuels Tax Fund to defray its share of the cost of a transportation study preliminary to the determination of when, where and what type of new highways will be constructed in and near that county.

We understand that large sums of money are now available under the Federal-Aid Highway Act of 1956 for highway planning and construction in urban areas and that the United States Bureau of Public Roads and the Pennsylvania and New Jersey Departments of Highways intend to conduct an intensive survey of the area within a 20-mile radius of downtown Philadelphia in order to provide essential information for assessing existing transportation needs and resources and for constructing vital improvements in the most advantageous sequence. This survey, covering the cities of Philadelphia and Camden together with portions of Bucks, Delaware, Montgomery and Chester Counties in Pennsylvania and adjacent areas in New Jersey, will insure that large outlays for construction improvements will be spent in the best interests of the region and that transportation arteries so constructed will be adequate to the needs of the area for not less than the next 25 years.

The estimated cost of the Philadelphia-Camden Metropolitan Area Transportation Study is approximately $2.3 million.[1] The cost of the survey is to be borne jointly by the participating parties. Of the $2.3 million required for the survey, New Jersey will contribute $300,000, the United States Bureau of Public Roads $1,000,000, and the Pennsylvania Department of Highways $666,667; the remainder ($333,333) is to

---

[1] This compares to an estimated $2 billion expenditure in the Philadelphia-Camden area over the next 25 years for roadway construction.

be contributed by Philadelphia ($241,000) and Bucks ($9,000), Chester ($3,666), Delaware ($48,000) and Montgomery ($31,667) Counties.

The Liquid Fuels Tax Act, supra, imposes a tax of three cents on each gallon of liquid fuels used or sold and delivered by distributors within the Commonwealth.[2] By virtue of article IX, sec. 18, of the Constitution of Pennsylvania, Amendment of November 6, 1945, the proceeds of all "gasoline and other motor fuel excise taxes" are required to be kept separate from the general funds of the Commonwealth. After deducting from the proceeds the cost of administration and collection of such taxes and the payment of obligations incurred in the construction and reconstruction of public highways and bridges, the net proceeds are earmarked solely for use in the "construction, reconstruction, maintenance and repair of and safety on public highways and bridges and air navigation facilities *and costs and expenses incident thereto*" (Italics supplied).

In faithful compliance with the command of article IX, sec. 18, of the Constitution, The Liquid Fuels Tax Act provides for the segregation of tax proceeds collected thereunder.[3] One-half cent of the three cent per gallon tax is paid into the Liquid Fuels Tax Fund of the State Treasury.[4] The remaining two and one-half cents per gallon is paid into the Motor License Fund and specifically appropriated therefrom "for the same purposes for which moneys in the Motor License Fund are appropriated by law".[5] We are here concerned only with the disposition of the one-half cent per gallon of

---

[2] See section 4, as amended, 72 PS §2611d. The act provides for exemptions and deductions for certain sales of liquid fuels but none of these has any relevance here.

[3] See section 10, as amended, 72 PS §2611j.

[4] See section 10(*a*), as amended, 72 PS §2611j(*a*).

[5] See section 10(*d*), as amended, 72 PS §2611j(*d*).

the tax which is paid into the Liquid Fuels Tax Fund of the State Treasury. Section 10 (a)[6] provides that these funds shall be paid over to the several counties of the Commonwealth on the first day of June and December of each year according to a specific formula. All moneys received by the counties are required to be deposited and maintained in a special fund designated as the County Liquid Fuels Tax Fund to be used for certain specified purposes, which are substantially the same as are provided for under article IX, sec. 18, of the Constitution. The exact language of sec 10 (a) is as follows:

"Moneys so received and deposited shall be used only for the purpose of *construction, reconstruction, maintenance, and repair of roads, highways and bridges, including the payment of property damage, now due or hereafter to become due, occasioned by or the relocation or construction of highways and bridges,* and for the payment of interest and sinking fund charges on bonds issued or used for highways and bridge purposes, or on so much of any bonds as have been used for such purposes, and all payments made by any county, either directly or indirectly, prior to the first day of January, one thousand nine hundred and forty-six, for any or all such purposes are hereby validated." (Italics supplied).

The fundamental question raised by your inquiry is whether a contribution by an interested county for the preparation of the Philadelphia-Camden Metropolitan Area Transportation Study may properly be made out of the County Liquid Fuels Tax Fund. Stated otherwise, the question is whether the collection, organization and analysis of transportation data for the area involved is such an integral and inseparable element in the construction of a modern highway that an

[6] 72 PS §2611j(a).

authorization for the use of funds for highway construction is necessarily an authorization for the use of funds for highway planning.

The purpose of all statutory and constitutional construction is to ascertain as clearly as is possible the intention of the authors of the language used.[7] And, in construing that language, we are required to give the words and phrases used their common and approved meanings.[8]

What, then, did the framers of the Constitution and the General Assembly intend when they restricted the use of liquid fuels excise tax funds for the purpose of "construction, reconstruction, maintenance and repair" of public highways and bridges? Certainly, an interpretation which would limit the expenditure of such funds to the physical construction, reconstruction, maintenance and repair would produce absurd results which, the legislature tells us, are to be avoided.[9] It would be wholly unrealistic to say that the construction of a highway means nothing more than the pouring of concrete. Roads cannot be constructed haphazardly. Modern highway construction requires careful, long-range planning; highway construction must be well conceived to be of enduring usefulness. Casual, chance or uncoördinated expansion of facilities is wasteful because such expansion cannot adequately keep pace with or provide for future requirements.

Careful analysis of the pertinent constitutional and statutory provisions plainly demonstrates that there was no intention to limit the use of these funds for physical construction only. Article IX, sec. 18, of the Constitution expressly authorizes the use of liquid fuel excise tax funds for, inter alia, "costs and expenses in-

---

[7] See section 51 of the Statutory Construction Act of May 28, 1937, P. L. 1019, 46 PS §551.

[8] See section 33 id., 46 PS §533.

[9] See section 52(l) id., 46 PS §552(l).

cident" to "construction, reconstruction, maintenance and repair", and for "costs and expenses incident" to insuring "safety on public highways and bridges". Planning and engineering are clearly incident to highway construction. Every highway being constructed by the Pennsylvania Department of Highways, individually or in association with the United States Bureau of Public Roads, is the result of painstaking planning, design and engineering.

Our modern multiple lane highways, resulting from the most advanced techniques of planning and design, including traffic surveys and studies of traffic flow, moderate grades, broad fluid curves, divided roadways, adequate clear sight distances, precision paving and so forth, have understandably achieved enviable safety records while promoting the free flow of vehicular transportation. These results are largely derived from the expenditure by the Department of Highways, often jointly with the United States Bureau of Public Roads, of substantial sums of money for the planning, design and engineering functions which today are integrally bound up in the construction of highways. We know of no attack that has ever been made upon the expenditure of motor license funds for such purposes.[10]

---

[10] In Peoples Bridge Company of Harrisburg v. Shroyer, 355 Pa. 599, 50 A. 2d 499 (1947), the Supreme Court of Pennsylvania enjoined the purchase of a toll bridge by the Department of Highways out of moneys in the Motor License Fund declaring, inter alia, that the word "construction" as used in article IX, sec. 18, of the Constitution was not intended to authorize the purchase of an existing toll bridge. This decision is patently not germane. The controversy there involved a "purchase", whereas the instant inquiry relates to the preparation of plans for the "construction" of highways.

In Kentucky, which has an "anti-diversion" constitutional provision similar to article IX, sec. 18, of our Constitution, the Court of Appeals sustained the use of highway funds for the "printing and distribution of road maps, bulletins, booklets, photographs

The failure of the legislature to include the phrase "and costs and expenses incident thereto" in sec. 10 of The Liquid Fuels Tax Act does not evidence any intention to restrict the use of moneys in a county liquid fuels tax fund to purposes narrower than those set forth in article IX, sec 18, of the Constitution. That the construction of highways involves the preparation of plans requiring the expenditure of liquid fuel excise tax moneys is recognized in sec. 10 (*a*) of The Liquid Fuels Tax Act,[11] wherein it is provided that:

" . . . no expenditure from the county liquid fuels tax fund shall be made by the county commissioners for new construction on roads or bridges *without first having obtained the approval of the plans for such construction from the Department of Highways.*" (Italics supplied.) [12]

---

and advertisements concerning" Kentucky highways: Keck v. Manning, 313 Ky. 433, 231 S. W. 2d 604 (1950). Similarly, in Grauman v. Department of Highways, 286 Ky. 850, 851, 151 S. W. 2d 1061, 1062 (1941), decided before the adoption of the Kentucky "anti-diversion" constitutional provision, the Court of Appeals, considering the uses to which highway funds could be put, aptly observed: "It can hardly be doubted that the term 'construction and maintenance' of the highway has a broader meaning than that of construction and maintenance of the actual road bed. We think the term is broad enough to include everything appropriately connected with and incidental to the construction and maintenance of an efficient road system, including the ordinary and usual devices used on roads to promote the safety and convenience of traffic."

[11] 72 PS §2611j(*a*).

[12] The propriety of such expenditures from a county liquid fuels tax fund is additionally supported by a further provision of section 10(*a*) of the act, 72 PS §2611j(*a*), which states that: ". . . the county commissioners shall not allocate moneys from the county liquid fuels tax fund to any political subdivision within the county, *until the application and the contracts or plans for the proposed expenditures have been made on forms, prescribed, prepared and furnished, and first approved by the Department of Highways.*" (Italics supplied.)

There is no doubt that moneys in a county liquid fuels tax fund may properly be expended for plans and other items of preparation reasonably necessary in the construction of public highways and bridges.

Condemnation and construction plans and drawings naturally fall within this allowable orbit; however, even condemnation and construction plans and drawings depend, ultimately, upon the gathering and processing of basic information, information which must also fall within the range of permissible expenditures. It is precisely this type of basic data that the Philadelphia-Camden Metropolitan Area Transportation Study will supply.

The proposed study is not intended as an academic gathering and processing of information relating to transportation problems. The United States Bureau of Public Roads now has available billions of dollars for allocation to the several States for the planning and construction of urban transportation arteries. Pennsylvania has already received proportionate allocations of these funds for the improvement of transportation facilities within the Commonwealth. A part of the Pennsylvania allocation will be spent in constructing highway improvements in the Philadelphia metropolitan area, perhaps as much as $2 billion during the next 25 years. The Bureau has allocated $1 million, to be matched by equal funds in Pennsylvania and supplemented by additional funds from New Jersey, for the preparation of a transportation study in the Philadelphia metropolitan area. As soon as the proposed study is completed we shall have a blueprint for immediate and future highway construction in this area.

The proposed study is expected to yield the following results:

1. An accurate assessment of existing transportation facts in the region as they affect highways, in-

cluding the natural capacity and efficiency of all transportation facilities and services, the characteristics of travel in the region, the population, economy and land uses in the region as they affect travel patterns.

2. A determination of immediately needed and achievable adjustments of the present transportation system of the region.

3. Projection of existing facilities in the light of conditions expected to obtain in 1975 and 1985 and the assignment of projected travel to alternative systems of transportation facilities and services for these dates.

4. Comparison of relative costs and relative benefits of the alternative schemes and of individual projects under consideration.

5. Preparation of a coordinated transportation plan which will meet the anticipated 1975 and 1985 transportation needs of the area more satisfactorily and with the most economical use of highway funds.

6. Development of a program for construction of transportation facilities and for changes in services based upon priority of need, the availability of funds and effects of individual projects on other parts of the total transportation system.

7. The making of adequate provisions for keeping the records of current facts up to date and for the periodic adjustment of projects and the amendment of plans and programs according to changing conditions.

The preparation of the Philadelphia-Camden Metropolitan Area Transportation Study under the joint auspices of the United States Bureau of Public Roads and the Pennsylvania and New Jersey Departments of Highways will produce adequate and exact data which will guide the engineering and construction of new highways and bridges in the area now and for many years to come. Condemnation, design and construction plans and drawings will be based on the information

178

and conclusions contained in the study. Study, design, condemnation and construction are all inextricably interwoven and, in the final analysis, represent one continuing process in the construction of public highways and bridges.

It is, therefore, our opinion and you are accordingly advised that affected counties may properly contribute moneys in their county liquid fuels tax funds for the preparation of the Philadelphia-Camden Metropolitan Area Transportation Study.